CALL, RESPONDENT, v. MARCUM, APPELLANT.

(No. 4,569.)

(Submitted November 4, 1921. Decided December 24, 1921.)

[203 Pac. 855.]

*Partnership—Wrongful Dissolution—Evidence—Insufficiency.*

Partnership—Wrongful Dissolution—Liability in Damages.
 1. For the dissolution of a partnership by the wrongful act of one of the partners, the wrongdoer is liable in damages to his copartner.

Same—Wrongful Dissolution—Evidence—Insufficiency.
 2. In an action for damages for the wrongful dissolution of a banking partnership, evidence showing that plaintiff changed the combination of the bank safe, so that defendant did not have access thereto, and subsequently removed and secreted all of the assets of the firm in a bank in another city, *etc., held* to show such breach of faith, and willful violation of the letter as well as the spirit of the trust imposed upon partners by section 5475, of the Revised Codes, as justified defendant in dissolving the partnership.

*Appeals from District Court, Cascade County; H. H. Ewing, Judge.*

ACTION by W. R. Call against J. E. Marcum. From a judgment for plaintiff and an order denying a new trial, defendant appeals. Reversed, with directions to dismiss the action.

*Mr. Fletcher Maddox,* for Appellant, submitted a brief and argued the cause orally.

Plaintiff was guilty of serious misconduct and defendant was justified as a matter of law in dissolving the copartnership. (*Breaux* v. *Le Blanc,* 50 La. Ann. 228, 69 Am. St. Rep. 403, 23 South. 281; *Thompson* v. *Langdon* (Cal. App.), 196 Pac. 103; *Howell* v. *Harvey,* 5 Ark. 270, 39 Am. Dec. 376; *Gillett* v. *Higgins,* 142 Ala. 444, 4 Ann. Cas. 459, 38 South. 664; see,

1. Dissolution of partnership because of misconduct of partners, see notes in 69 Am. St. Rep. 430; 4 Ann. Cas. 460.
 Right of one partner to maintain action at law against the other for damages from wrongful dissolution of firm, see note in 4 A. L. R. 158.

also, Mechem on Partnership, sec. 377; 30 Cyc. 657; 20 R. C. L. 956.)

*Mr. Stephen J. Cowley* and *Messrs. Cooper, Stephenson & Hoover,* for Respondent, submitted a brief; *Mr. Cowley* argued the cause orally.

MR. JUSTICE COOPER delivered the opinion of the court.

The plaintiff brought this action against defendant to recover damages for the wrongful dissolution of their partnership, before the expiration of the period for which it was formed. By the contract defendant agreed to "leave $25,000 in real estate and cash as the property worth of the banking business formerly known as the J. E. Marcum Bank at Cascade, Montana." It was agreed that the business should be conducted under the firm name of "J. E. Marcum & Co., Bankers"; that the defendant should act as president without compensation, the plaintiff as "cashier of the said firm"; and that he should in addition thereto "attend to other business for the said J. E. Marcum, at Cascade, Montana," for which he was to receive a salary of $80 per month. The profits were to be divided equally between them after the running expenses of the firm, and eight per cent of the $25,000 furnished by the defendant, were paid. The complaint sets forth the terms of the copartnership agreement, alleges its full and faithful performance by the plaintiff, the wrongful acts of defendant entitling him to a dissolution, and prays an award of damages commensurate to the wrong he claims to have suffered thereby.

Beside denials putting in issue all the averments of the complaint, the answer contains affirmative matter as follows: For some years prior to January 24, 1913, the defendant had himself conducted a successful banking business in the town of Cascade; that the plaintiff understood that their agreement contemplated a termination of its obligations at the end of each year, and a balancing and settlement of all accounts between them on the last day of the year 1913, and at the end

of each succeeding year; that at the end of each year, including 1916, adjustment and division were had accordingly; that by mutual understanding the terms of the agreement were modified to meet the demands of the growing business, leaving unaffected the right of either party, at will, to renew or terminate the copartnership. It further avers that during the month of September, 1917, the plaintiff informed defendant that he had been drafted into the United States army, and that he would be obliged to withdraw from the firm, and directed the defendant to procure some suitable person to take his place; that defendants, with plaintiff's knowledge, consent and approval, employed another man in his stead, the defendant then and there agreeing to continue to pay him the salary of $80 per month to the end of the year and to give him half the profits of the firm business up to that time. It is also alleged that on December 11, 1917, the plaintiff, having secured exemption from army service, refused to carry out his agreement to dissolve the partnership. In another and distinct defense, it is alleged that during the year 1914 the plaintiff took $4,000 of defendant's individual money from deposit in the bank, and on his own account invested it in the capital stock of the Mattson Lumber Company, then doing business at Cascade; that after attaching to the note as collateral security a certificate of stock of that company, he afterward withdrew it, leaving the unpaid balance of $1,500 wholly unsecured; that instead of devoting his entire time and attention to the affairs of the copartnership, the business of the lumber company, and other matters unconnected with the bank business, consumed so much of plaintiff's time as to seriously interfere with his management of the bank, and provoked a demand by the state bank examiner that the partnership be dissolved. It further charges that "at some date unknown to the defendant, but prior to December 3, 1917," the plaintiff changed the combination of the vault in the bank and refused to permit the defendant to have access to his own private papers and property, or to those of the bank; that on the date

last named, it being a business day, at the hour of 9 o'clock in the morning, upon the appearance at the door of one C. N. Reed, accompanied by the defendant, the plaintiff locked the vault, pulled down the shade on the door, and announced that the bank was closed; that defendant called up by telephone the state bank examiner, advised him of the plaintiff's actions, and requested him to come to Cascade and assist him in reopening the bank; that upon his arrival he ordered and compelled the plaintiff to open the vault and to give the defendant access to his own papers and those of the bank as well; that at some time prior to December 11, 1917, the date the defendant does not know, the plaintiff secretly, wrongfully, in bad faith, and against the defendant's will, removed from the vault all the paper assets, notes, bills receivable and securities, the property of the defendant and constituting a valuable resource of the bank of the value of approximately $140,000, took them to Great Falls, and kept them in a bank in that city until the twenty-fourth day of December, the bank meanwhile being without assets or securities with which to transact its business. In addition to these charges it is alleged that the plaintiff conspired with others to secure a charter for the purpose of establishing another bank in the town of Cascade, and to use that as a threat to coerce, intimidate and compel defendant either to buy the plaintiff out at an unreasonably high price or to force a sale of his interest therein to him at a grossly unfair and inadequate consideration.

To the answer plaintiff filed a reply, putting in issue all the charges of misconduct made against him. A trial was had before the court and a jury, which resulted in a verdict for plaintiff. From the judgment entered thereon, and an order denying a new trial, defendant appeals.

Each partner charges the other with a breach of the partner-[1] ship agreement. Unless by a preponderance of the evidence misconduct on the part of the defendant in forcing a dissolution is established, the judgment should be reversed. Having regard to the nature of the relationship created by the

agreement between them, the verdict must respond to the allegations and the proof. Does the proof show misconduct and bad faith as the complaint charges? If the dissolution was brought about by the wrongful acts of one or the other of the parties, the one at fault must answer for the consequences. (Rev. Codes, sec. 5495.)

The law touching the relative rights, duties and obligations of partners in their relations to each other is stated by an eminent author thus: "As the contract itself has its solid foundation in the mutual respect, confidence and belief in the entire integrity of each partner, and his sincere devotion to the business and true interests of the partnership, good faith, reasonable skill and diligence, and the exercise of sound judgment and discretion are naturally, if not necessarily, implied from the very nature of the relation of partnership. * * * Of course, all losses, injuries and damages sustained by the partnership from the positive breach of the stipulations contained in the articles of copartnership, on the part of any partner, are to be borne exclusively by that partner, and he must respond over to them therefor." (Story on Partnership, sec. 169.)

The above declaration is but another way of stating the rule found in the chapter of our Code entitled "Mutual Obligations of Partners." (Rev. Codes, secs. 5474–5477.) Partners are there declared to be trustees for each other, their relations confidential and their obligations as defined in Chapter 1 of the title on Trusts. By the terms of section 5475, in all matters connected with the relation, each is bound to act in the highest good faith to the other, and the slightest misrepresentation, concealment, threat or adverse pressure of any kind is prohibited. Each member is obliged to account to the other for everything he receives on account thereof. (Sec. 5476.) The plaintiff in the present case, undertaking as he did to give his personal attention to the business of the firm, could not rightfully, without the consent of his copartner, engage in any business which would prevent him from giving to the business

all the attention which would be advantageous to it. (Sec. 5486.) Under the mandate of subdivision 2 of section 5496, if either partner fails to perform his duties under the agreement of partnership, or is guilty of misconduct, the unoffending partner is entitled to a judgment of dissolution.

By the plaintiff's evidence the following facts are established:
[2] In the early days of October, 1917, the plaintiff changed the combination of the safe in the bank, that being the usual depository for the paper assets of the firm, and those of the defendant intrusted to his care under the partnership arrangement, refusing to permit the defendant to see them until he was forced by the state bank examiner to open the safe and to give him access thereto. On December 11 he took all the assets of the firm, including those of the defendant, to the city of Great Falls, secreted and held them there until December 24, when, upon the advice of his counsel, he delivered them to the defendant. Among the papers thus taken by him was a note in the sum of $1,500, the property of the bank, known as the Eller note. This, according to his testimony, was in his possession at the time of the trial, and, so far as we are able to determine from the record, it was never returned to the bank or to the defendant.

At the time of the trial the plaintiff was a young man twenty-five years of age; the defendant was sixty-seven. In the month of November, 1910, the plaintiff was employed in the general store of the defendant in the town of Cascade as an office man or clerk. From that work he was advanced by the defendant to the position of cashier of the bank, which was the predecessor of the one in question. Concerning the incidents leading up to the misunderstandings between the parties, the plaintiff testified as follows: "Q. What time was it that Mr. Marcum was not in possession of the combination of that safe? A. I think it was at a time after I was advised to take measures to protect myself. Q. Well, when? I don't care who advised you. A. I don't remember when it was. It was some time after October 7. Q. After October 7? A. Yes, sir. Q.

And before when? A. I don't remember; before that difficulty came up with the state examiner. Q. Before December 3? A. Yes; before December 3. Q. How many days before that? A. I don't remember. Q. Can't you recall an important matter of that kind? A. I didn't consider it important. Q. You didn't consider it an important matter, in partnership with Mr. Marcum, to change the combination on the safe? A. That was simply one of the details I did, in an effort to protect myself against him. Q. You didn't regard it as an important matter, when you say your counsel had advised you to do it? A. It was one of the details. Q. Oh, just a mere detail? A. Yes. * * * Q. This change was without his consent, was it? A. It was; yes. Q. What did he want in the vault that Sunday morning? A. He wanted his private papers. * * * Q. You had them placed where he couldn't find them, didn't you? A. I had them placed in a place where they were not ordinarily kept. * * * Q. You didn't show him the package that day at all, did you? A. I don't think I did; no. Q. What is your recollection of the aggregate face value of those papers? A. Those papers probably would have amounted to between $125,000 and $150,000 at that time.'' He testified further on cross-examination as follows: ''I don't remember, but I think the paper assets of the bank, its notes and securities, were in my pocket when I went out of the bank. Those securities amounted to something in the neighborhood of $140,000. They must have been in my pocket. They were somewhere about my person at the time. * * * I had the notes with me. In coming into the front part of the room, I put the notes into my pocket. * * * I didn't return it [them] to the bank immediately upon discovering it was upon my person, because—I did not return it to the bank, from which I took it, because the bank had been taken charge of by people who had no interest in it. I regarded that fact a sufficient reason for carrying off $140,000 worth of securities. * * * I brought those securities to Great Falls on the afternoon train. That represented my conception of my duties as cashier of the bank; I don't re-

member that among those securities there were some $10,000 of certificates of deposit. * * * I retained those securities in my possession from December 11 to December 24. During that period I did not notify the creditors to make payment on obligations coming due during that period. I made no effort to collect any of those assets. There were two certificates of deposit issued on the Conrad Bank for $10,000. They were carried as resources. * * * The $1,500 note known as the Eller note was not restored; it was not taken away with the other papers. I believe I have it in my possession. I do not know that I have it just as well as I am sitting here in this chair. I think it is in my possession. * * * The note is part of the assets of the bank. I still owe Mr. Marcum some $1,500. * * * I did not notify Mr. Marcum where the bank assets were. I kept quiet about that."

The effect of this evidence cannot be misunderstood, and should not have been overlooked so completely in the court below. The acts of the plaintiff clearly involved all the elements of concealment, adverse pressure, bad faith and a willful violation of the letter as well as the spirit of the trust imposed by section 5475, supra, upon any conception of the relationship between the parties. The flimsy and unfounded claim made in the complaint that the defendant "wished to dispense with his services, and to dismiss him from the banking business," in order that he might substitute his son-in-law, Mr. Reed, as a partner in his stead, is not only unsupported by the testimony, but entirely disproved by the admissions above set forth.

From the foregoing it is obvious that the conclusion we have reached is not based upon inferences we have drawn from isolated statements, or from testimony of doubtful meaning or of double import. From all the testimony it is apparent that responsibility for the loss of mutual confidence and respect was due to plaintiff's own willful misconduct, and was enough to justify the defendant in declaring their relations at an end. As reflecting the attitude of the defendant toward plaintiff

prior to the overt acts which finally culminated in the occurrences of December 11, the following testimony given by the plaintiff is illuminating: "Mr. Marcum often said he wanted me to do well, and, if I didn't do well, he would try to help me out. He loaned me money occasionally, and I usually made money out of the money he loaned me. Mr. Marcum in 1916 made an investment in grain, saying that, if he made anything out of it, he would give me something. I believe he sent me down a check for $80, which he said was my part of the profits. He gave me that gratuitously. Up until the time our trouble started, he was a mighty fine partner. I don't know as I can say he treated me very much as a son, but he treated me in every way that I could wish to be treated in business. He signed an affidavit to enable me to obtain exemption from military service. I don't know that he did that much for his son-in-law, Reed. * * * During the years I was there, Mr. Marcum made me some loans. I presume you might call them substantial. He loaned me at one time over $3,000. He never at any time asked for any security on any of the loans that he made to me. He had been very good to me all those years."

This testimony shows a benevolent attitude, rarely exhibited by one person to another having no ties of blood or kinship. Upon the record at the close of the evidence, the court should have given the peremptory instruction requested by defendant to find a verdict in his favor, and that, too, upon the evidence of the plaintiff alone. To us it is apparent that, not only the jury, but the trial court also laid too much stress upon the incidents occurring in the bank of December 11, and overlooked entirely the willful and persistent breaches of faith, beginning in the early days of October and continuing down to the occurrences of December 3 and December 11, which culminated in the asportation of all the assets of the bank and those of the defendant as well.

Pothier, in his ancient treatise on Partnership, says: "Every partnership is dissolved by the extinction of the business for

[62 Mont. 73.]

which it was formed." (*Griswold* v. *Waddington,* 16 Johns. (N. Y.) 438.)

The loss of its entire capital left the bank without means with which to function, and destroyed the business the copartnership created. If, therefore, the plaintiff's actions in seizing and detaining the assets were not destructive of the business, as contemplated by Pothier, they afford an analogy and a reason equally strong for considering the relations entirely severed. (See Story on Partnership, sec. 288; 1 Rowley on Partnership, secs. 586–588; 30 Cyc. 656, 658, and cases in footnotes; *Kennedy* v. *Kennedy,* 3 Dana (Ky.), 239; *Sieghortner* v. *Weissenborn,* 20 N. J. Eq. 172.)

The complaint was drawn as in an action at law, and while the Code provides but one form of action, which embraces all that was formerly comprehended in actions at law and suits in equity, the plaintiff, in order to prevail, was bound to establish the defendant's misconduct by a preponderance of the evidence. This he has not only signally failed to do, but, on the contrary, his own evidence shows that he has no cause of action, and that the defendant was amply justified in dissolving the partnership.

For these reasons, the judgment and order appealed from are reversed, with directions to dismiss the action.

*Reversed.*


MR. CHIEF JUSTICE BRANTLY and ASSOCIATE JUSTICES REYNOLDS, HOLLOWAY and GALEN concur.

ON MOTION FOR REHEARING.

(Decided January 31, 1922.)

MR. JUSTICE COOPER delivered the opinion of the court.

The motion for a rehearing is denied. Nothing said in the opinion, however, is intended to foreclose the plaintiff from bringing his action against the defendant, if he so desires, for an accounting and final settlement of the partnership affairs.

MR. CHIEF JUSTICE BRANTLY and ASSOCIATE JUSTICES REYNOLDS, HOLLOWAY and GALEN concur.